The Union Railway and Transit Company

*v.*

Louisa Shacklet, Admx.

*Filed at Mt. Vernon January 25, 1887.*

1. Negligence—*negligence of another contributing to the injury.* A railway company will not be excused from the consequences of its own negligence, or its liability for an injury caused thereby, from the fact that another company was more culpably negligent than it, thereby contributing to the injury, as, in the case of a collision of trains causing the death of a passenger.

2. Parties—*representative capacity of the plaintiff—whether it must be proven, and in what way.* In an action on the case by one suing as administrator of an estate of a deceased person, against a railway company, to recover for causing the death of the plaintiff's intestate, unless the representative capacity of the plaintiff is put in issue by plea, it is not necessary to

make any proof of his letters of administration, or his appointment, or right to sue in such capacity.

3. The appointment of one as administrator of an estate, when that fact is put in issue, may be shown by an examined copy of the record of the appointment, satisfactorily proved, by oral testimony, to be a true copy thereof.

4. ACTION—*remedy—in case of a new right given by statute.* Where a statute gives a new right, without providing a special remedy for its enforcement, it may be enforced by any appropriate common law action.

5. APPEAL—*reviewing the facts—for what purpose.* Where it is claimed there is no evidence of a fact, as, negligence in operating a train of cars, upon which to base an instruction, and the alleged error in giving the instruction depends upon there being no evidence tending to prove the fact, this court will examine the evidence to see if it does prove, or tend to prove, such fact.

WRIT OF ERROR to the Appellate Court for the Fourth District;—heard in that court on appeal from the City Court of East St. Louis; the Hon. WM. P. LAUNTZ, Judge, presiding.

Messrs. G. & G. A. KOERNER, for the plaintiff in error.

Mr. M. MILLARD, for the defendant in error.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

In the month of September, 1879, Elijah E. Shacklet, the plaintiff's intestate, and his brother, Abraham Shacklet, who were shippers and dealers in stock, shipped four car-loads of cattle, by way of the Missouri Pacific railroad, from Dresden, Missouri, to the National Stock Yards, in East St. Louis. The Missouri Pacific Railroad Company gave through bills of lading for the stock, and stock passes to the shippers. There was a caboose attached to the Missouri Pacific train, in which the Shacklets rode until they reached the Union depot, in St. Louis, where they were told to change cars. The cars containing the cattle were then detached from the Missouri Pacific train, and turned over to the Union Railway and Transit Company, to be taken by it to the National Stock Yards, in East St. Louis. The train of the transit company in which

the detached cars were placed for this purpose, had on this occasion no caboose attached to it for the accommodation of shippers, though the evidence shows a caboose car was sometimes provided for this purpose. The deceased and his brother, finding no caboose attached to the train, took positions on the top of one of the stock cars, preparatory to starting. This being observed by one of the employes of the transit company, they were directed by him to get down and go to the engine. On attempting to get in the cab on the engine, they were ordered by the engineer to take a place in front, on the engine. This being the only place provided for them, they accordingly did so. Being carried in this manner, they passed through the tunnel over into East St. Louis, and were proceeding on their way to the stock yards, when suddenly, while rounding a sharp curve in the track, and almost at the end of their destination, the train carrying them collided with another, belonging to the Wabash, St. Louis and Pacific Railway Company, which, at the time, was being rapidly backed out from the stock yards. The front of the tender upon which the parties were riding, being sloping and wedge-shaped, the rear car of the Wabash train was forced, in the collision, up the tender, catching the plaintiff's intestate between it and the car, and inflicting upon him serious injuries, from which he died in a few minutes thereafter. Shacklet, at the time of his death, was a resident of Pettis county, Missouri. He died intestate, leaving the defendant in error, his widow, and three minor children. The defendant in error, having first taken out letters of administration on her husband's estate at the place of his domicile in Missouri, brought the present action in the City Court of East St. Louis, against the appellant, to recover damages for the death of her husband, which, she alleges, was caused by the latter's negligence. The trial resulted in a judgment of $5000 for the plaintiff, which was subsequently affirmed by the Appellate Court for the Fourth District. The company brings the case here for review.

The accident which caused the death of Shacklet, occurred on a short line of railway belonging to the National Stock Yards, and connecting the various roads passing through and terminating at East St. Louis, with the stock yards, and was used exclusively for transferring and carrying stock to and from the stock yards. It was open alike to all the owners and operators of railways having occasion to use it for such purpose.

The substance of the charge of negligence, in the declaration, shortly stated, is, that at the time of the collision the defendant was operating its train without having first ascertained whether or not the track was obstructed by other trains. Whether this charge was proved or not, of course, was a question for the Appellate Court, and not for this; yet for the purpose of passing upon the plaintiff's first instruction, it is proper to advert to some of the evidence, as it is claimed there is no evidence upon which to base it. The instruction is as follows:

"The jury are instructed, that if it appears, from the testimony, the defendant company was guilty of negligence which materially contributed to the injury complained of, and that the said Elijah E. Shacklet was exercising due care, the plaintiff is entitled to recover, although the Wabash company may have also been guilty of negligence in causing the death of the plaintiff's husband."

Notwithstanding the very sweeping assertion of counsel for plaintiff in error, that the collision in question was produced by the Wabash without the slightest fault on the part of the Union Transit Company, we feel constrained to say, that after a very careful examination of the record we fail to find the statement verified by the evidence. For instance, Mr. Dasey, the very first witness examined, in giving an account of the affair, says: "Mr. Shacklet was sitting on the tender of the engine of the transit company, and there was a very short curve at the stock yards, and in going around the curve there

was a Wabash train in there, backing out, and in making this curve the trains collided. The transit engine *ran into the Wabash train,*—the hind end of the Wabash train. *Both trains were moving when they collided, and when they came together.* \* \* \* · There were no particular rules as to the use of those tracks. The transit company generally had the best show there. The tracks all belonged to the National Stock Yards. The engines of. the different roads went in and out any way they could. \* \* .\* The incoming train did not necessarily have to go on this track where the collision occurred, to unload the stock, but seventy-five yards further on it necessarily would have to get on there." John Kay, the next witness, states, among other things : "There were no rules, that I know of, in regard to the right of the track. Different companies used the tracks just as they found them. I knew the engineer and conductor. They were perfectly familiar with the manner these tracks were used by other companies. They generally whistled going around the curve. Simply looking out for each other, was the way they avoided accidents." Absalom Burton, another witness, states : "The Wabash train was backing out. Trains coming out of there usually came out that way." Charles Smith, a witness for the defendant, who was the engineer on the transit company's train at the time of the collision, says, in speaking of the place where the accident occurred : "It is a bad, a very bad, place, and we have always looked out. *We always expected a train there,* so I was going round very slow." It is shown by other testimony, that on the curve where the collision occurred one could see but a very short distance,—not to exceed, perhaps, seventy-five yards, and one of the witnesses puts it much below that.

There is no attempt on the part of the company to show, nor does it otherwise appear, that the defendant had taken any means whatever to ascertain whether the track was clear or not, or to prove that the defendant's train had the right

of way. In fact, the very contrary is shown. Nor does it appear that the company, although daily running its trains to and from the stock yards, had any system of telegraphing, telephoning, or of flagging, to either give or receive notice of the approach of its own trains, or of those belonging to other companies. The only thing done to avoid danger was the ringing of the bell or sounding the whistle while rounding the curve. But that clearly could be of no avail where a long train like that of the Wabash had commenced already to back out, as is abundantly proved by the accident in question. The protection afforded by the ringing of the bell and sounding of the whistle, under the circumstances shown, is hardly so good as that which the crew of a vessel at sea, enveloped in an impenetrable fog, derives from the monotonous notes of the fog-horn. While the expedient of the fog-horn, in the case of the vessel, is by no means absolute security against collisions, yet it is, under the circumstances, about all that can be done. Not so with the plaintiff in error. By a proper system of flagging, or other like precautions, the company might doubtless have attained almost absolute security against collisions with other trains. But nothing of this kind was done, or attempted to be done. On the occasion in question, as usual, the train was blindly forced around the curve, at a speed, as one of the witnesses swears, of six miles an hour, in expectation, as defendant's own witness swears, of encountering other *trains!* From the evidence before us, it is clear that the companies doing business over the stock yards tracks, as a general rule, operated their trains in a grossly negligent manner, and the transit company was equally guilty with the others. It is true, the Wabash company, on the occasion in question, was, perhaps, more culpable than the defendant, but that can not avail the latter. It is quite clear, from the evidence to which we have adverted, there is no foundation for the claim that the instruction is obnoxious to the objection taken to it.

There is but one other question arising upon the record, to be noticed. Counsel for plaintiff offered in evidence, on the trial, what was claimed to be a copy of letters of administration granted by the probate court of Pettis county, Missouri, to the defendant in error, on the estate of her husband. It was admitted by counsel on the other side, for the purpose of raising the question of law whether the existence of a record could be thus established, that the county clerk or county judge of said probate court would, if present, testify that the instrument offered was a true copy of the record; but it was insisted that the only way such proof could be made was by the production of a copy of the record of the letters, duly authenticated, as required by the act of Congress. The court overruled the point, and admitted the copy of letters in evidence, and its ruling in this respect is assigned for error.

There are two complete answers to the point raised: *First,* the right of the plaintiff to sue as administratrix not having been put in issue by plea, it was not necessary to make any proof in respect to her appointment or right to sue in her representative capacity. Replying to this view, counsel say: "This is true as a general proposition, but this is a proceeding under the statute. The administrator, in such a case, is not the real representative of the deceased, representing his property or his claims to property. He is the creature of the statute, and represents the widow and next of kin. He is their trustee, as it were, and it has heretofore been the common practice to prove the letters in such cases, although there was no special denial. The case relied upon by defendant in error, (92 Ill. 317,) is not in point, as it is only by way of illustration, and speaks of ordinary administrators." The view here suggested we do not regard as sound, and the reasons assigned for departing from the general rule referred to, are, in our judgment, clearly insufficient. While the right to sue is given by statute, and the creditors of the deceased are excluded from participating in the amount recovered in a suit of

this kind, yet the action by which this right is to be enforced can not be regarded as a statutory proceeding. A mere glance at the pleadings in the case will show that the proceeding is nothing more than an action on the case at common law, and being so, the rules of pleading and proofs are the same as in any other action on the case, or, indeed, in any other common law action. It is a familiar principle, that whenever a statute gives a new right without creating a special remedy for its enforcement, it may be enforced by any appropriate common law action. That is just the case here. So where a right is to be enforced by a common law action, it is wholly inconsequential whether the right has been conferred by statute or by the common law, so far as the procedure in court is concerned. It will be remembered that a large portion of that vast body of maxims and legal rules, known as the common law, had its origin in ancient British statutes; yet, in giving effect to rights accruing under them through the instrumentality of legal proceedings, no question is ever made as to how those rules and legal maxims originated, with a view of determining the procedure. The same is true in respect to all rights arising under our own statutes, where no special or statutory remedy has been provided.

We do not think there is anything in the suggestion that the administrator's relation to a claim like this is different from that which he sustains to any other claim where his title accrues upon his appointment and acceptance of the office and trust of administrator. Whether he takes for the creditors, the widow and next of kin, or for the widow and next of kin alone, his title in either case arises *ex lege*, and he takes and holds, by virtue of his office as administrator, for the benefit of those whom the law points out as the persons entitled. Whether this is done by a general law or by a statute, can make no possible difference. Nor do we appreciate the force of the suggestion that the administrator is a trustee, as to a claim of this kind, in a different sense from

that which he is in respect to other claims held or prosecuted by him in his representative capacity. We are of opinion there is nothing in the suggestion. But conceding him to be a trustee in the strictest sense of the term, still it does not follow that his relation in this respect will require any change in the rules of pleading or evidence when he brings a common law action to enforce such a claim, for a court of law has nothing to do with the equities of those on behalf of whom he sues.

*Secondly*—Assuming, however, for the purposes of the argument, that it was necessary for the plaintiff to prove her appointment as administratrix, there is no doubt but that an *examined copy* of the record of her appointment, satisfactorily proved by oral testimony to be a true copy, was sufficient for that purpose. That proof of a record, for the purpose it was offered in this case, may be made by an *examined copy*, is so well settled and elementary in its character, we decline to discuss the subject. 1 Greenleaf on Evidence, 501; Freeman on Judgments, sec. 408; 1 Wharton on Evidence, secs. 94-98; Abbott on Trial Evidence, pp. 23, 536.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*